Vicky Ravijojla POWELL, Petitioner,

v.

Laura H. TANNER;  Harcourt Brace
& Company;  and The Hertz
Corporation, Respondents.

Nos. S–10254, S–10264.

Supreme Court of Alaska.

Nov. 22, 2002.

John R. White, The Law Offices of Jody Brion, Anchorage, for Petitioner.

Donald C. Thomas, Delaney, Wiles, Hayes, Gerety, Ellis & Young, Inc., Anchorage, for Respondents.

Before: FABE, Chief Justice, MATTHEWS, and BRYNER, Justices.

*OPINION*

FABE, Chief Justice.

## I. INTRODUCTION

These consolidated petitions for review arise out of an automobile accident which occurred when Laura H. Tanner changed lanes and her automobile collided with Vicky Ravijojla Powell's automobile. Tanner was driving a Hertz rental car and was working for Harcourt Brace & Co. at the time of the accident. The trial court granted summary judgment dismissing Powell's vicarious liability claims against Harcourt. The trial court also struck thirty-seven witnesses from Powell's final witness list who had not been named as witnesses until after the close of discovery. Because there is a genuine issue of material fact regarding whether Tanner is a Harcourt employee, making Harcourt potentially vicariously liable for Tanner's actions, summary judgment was improperly granted in favor of Harcourt. In addition, because any immediacy which required striking thirty-seven of Powell's witnesses no longer exists, we need not address whether the order striking Powell's witnesses was an abuse of discretion.

## II. FACTUAL HISTORY

Tanner began working for Harcourt, a publishing company that publishes and sells educational materials, after responding to an advertisement placed by Harcourt stating "educational publisher needs teacher." Tanner worked for Harcourt from the summer of 1996 to the summer of 1998. On March 1, 1997, Tanner signed Harcourt's "Per Diem Agreement for Independent Contractors" which specified that Tanner had been "engaged, on a per diem basis [at $125 per day], for no more than 16 days ... [to] sell[ ] all Harcourt Brace School Publishers programs in the state of Hawaii." [1]

In August 1997 Tanner came to Anchorage to conduct demonstrations of educational materials for Harcourt at an Anchorage School District in-service for teachers. Tanner arrived in Anchorage on August 20, 1997, the

---

1. Tanner also had an hourly contract with Harcourt, entered into on May 1, 1997, under which she performed administrative work for Harcourt, such as contacting schools to see if they were interested in receiving samples of Harcourt's materials and setting up a database.

day of the accident, and checked into her hotel. Tanner picked up a rental car from Hertz and drove to a storage facility to retrieve the Harcourt materials she needed for her presentation the following day. While driving back to the hotel, Tanner attempted to change lanes and Powell and Tanner's vehicles collided, allegedly causing injuries to Powell's person and automobile.

## III. DISCUSSION

### A. The Superior Court Erred in Granting Partial Summary Judgment to Harcourt.

#### 1. Procedural history relating to summary judgment

Powell brought suit against Tanner, Harcourt, and Hertz, alleging that Harcourt and Hertz "are vicariously responsible for defendant Tanner's acts and omissions under the theories of respondeat superior, agency, joint enterprise, negligence, negligent entrustment, and negligent supervision." Powell further alleged in the complaint that the accident caused severe injuries to her neck, head, back, arms, knees, bladder, abdomen, ribs, and face, as well as damage to her vehicle. In the answer, Harcourt admitted that "Tanner was in the course and scope of her contract with Harcourt at the time of the accident, and that Harcourt paid for the rental of the vehicle Tanner was driving."

Harcourt and Hertz moved for partial summary judgment, seeking to dismiss all claims against them. Harcourt argued that Tanner was an independent contractor at the time of the accident and so Harcourt could not be vicariously liable for Tanner's actions under the "independent contractor rule."

After considering the motion for summary judgment and Powell's opposition, the superior court summarily granted the motion for summary judgment in favor of Harcourt and Hertz, dismissing all claims against them. The superior court subsequently denied Powell's motion to reconsider. Powell petitioned this court to review the summary judgment order. She did not seek review of the court's order dismissing all of Powell's claims against Hertz. We granted Powell's petition.

#### 2. Standard of review relating to motion for summary judgment

We review a grant of summary judgment de novo and adopt the rule of law that is most persuasive in light of precedent, reason, and policy.[2] To obtain summary judgment, the moving party must prove the absence of a genuine factual dispute and its entitlement to judgment as a matter of law.[3] All reasonable inferences of fact are drawn in favor of the nonmoving party.[4]

Because characterization of the relationship between Harcourt and Tanner is ordinarily an issue for the trier of fact, the burden is initially on Harcourt to affirmatively demonstrate that Tanner was an independent contractor rather than an employee.[5] If Harcourt makes this prima facie showing, Powell must then establish facts from which it reasonably may be inferred that Tanner was an employee.[6] In other words, Powell must prove that a genuine issue of fact exists by showing that she can produce admissible evidence reasonably tending to dispute Harcourt's evidence.[7]

#### 3. There is a factual dispute regarding whether Tanner was Harcourt's servant or its independent contractor.

"Under the doctrine of respondeat superior, an employer is liable for the negligent acts or omissions of his employee committed within the scope of his employment."[8]

---

2. *State v. Alaska Civil Liberties Union*, 978 P.2d 597, 603 (Alaska 1999); *Cool Homes, Inc. v. Fairbanks North Star Borough*, 860 P.2d 1248, 1254 (Alaska 1993).

3. *Alaska Civil Liberties Union*, 978 P.2d at 603.

4. *McGlothlin v. Municipality of Anchorage*, 991 P.2d 1273, 1277 (Alaska 1999).

5. *See Sterud v. Chugach Elec. Ass'n*, 640 P.2d 823, 827 n. 8 (Alaska 1982).

6. *See id.*

7. *See Lincoln v. Interior Reg'l Hous. Auth.*, 30 P.3d 582, 586 (Alaska 2001).

8. *Luth v. Rogers & Babler Constr. Co.*, 507 P.2d 761, 762 (Alaska 1973); *see also* PROSSER AND KEETON ON TORTS § 70, at 501–03 (5th ed.1984).

Harcourt has admitted that "Tanner was in the course and scope of her contract with Harcourt at the time of the accident, and that Harcourt paid for the rental of the vehicle Tanner was driving." However, the parties dispute whether Tanner was an independent contractor or an employee. Under the "independent contractor rule" the doctrine of respondeat superior does not apply to acts of independent contractors: "Because such an employer normally does not control the work of the independent contractor, he is not held liable for the torts of the contractor and its employees." [9]

■ An independent contractor is "any person who does work for another under conditions which are not sufficient to make him a servant of the other." [10] We have employed the Restatement (Second) of Agency § 220(2) (1958) factors defining a servant to determine the nature of the relationship between a worker and an employer: [11]

(1) A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.

(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.[12]

We have used the language of comment c to the Restatement (Second) of Agency § 220 to describe the degree of control required under Restatement (Second) of Agency § 220(2)(a) to impose vicarious liability:

It is not enough that [the employer] has merely a general right to order the work stopped or resumed, to inspect its progress

9. *Parker Drilling Co. v. O'Neill,* 674 P.2d 770, 775 (Alaska 1983). For purposes of determining whether Harcourt is vicariously liable under a theory of respondeat superior, we assume that Tanner was negligent. *See Sterud,* 640 P.2d at 825 ("For purposes of this [vicarious liability/respondeat superior] theory, the negligence of Hansen or Smith is assumed.").

10. RESTATEMENT (SECOND) OF TORTS § 409 cmt. a; *see also Soderback v. Townsend,* 57 Or.App. 366, 644 P.2d 640, 641 (1982) ("An independent contractor, as distinguished from a mere employee, is one who, carrying on an independent business, contracts to do a piece of work according to his own methods, and without being subject to the control of his employer as to the means by which the result is to be accomplished, but only as to the result of the work.") (citation omitted).

11. *Sterud,* 640 P.2d at 826.

12. *See also Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 751–52, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) ("In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.") (citations omitted).

or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.[13]

Harcourt exercised control over some aspects of Tanner's work. But because the evidence leads to no clear conclusion whether Tanner is, or is not, an employee of Harcourt, it is for the jury to decide the nature of their employment relationship.[14]

On one hand, Harcourt controlled where Tanner held her in-service demonstrations and the type of administrative work that she performed. Harcourt paid for Tanner to attend a training session on its materials and suggested that she dress professionally for the job. Harcourt provided Tanner with the names of the schools where she was to make in-service presentations, and provided her with specific material for use at her presentations, including training outlines. Sasha Hedona, a Harcourt sales representative, scheduled some of the in-services where Tanner made presentations, while other times Tanner would call and schedule in-services for times which were convenient for her. Hedona attended some, but not all, of the in-service demonstrations that Tanner performed in Anchorage, but Tanner often did not know which demonstrations Hedona would be attending. Harcourt also directed Tanner to reserve her flight to Alaska through Harcourt's travel agent and Harcourt directly paid for Tanner's flight and car rental.

On the other hand, in her affidavit, Tanner indicated that for her work in Anchorage, she "re-worked an outline and determined how to present the Harcourt Brace training material to the teachers [she] instructed." In making presentations, Tanner used her own overheads or used ones she received from other people and there were no scripts which she was required to follow. She testified that "[h]ow I presented [Harcourt's] materials was up to me." She could refuse assignments she felt were outside of her expertise, and she could reschedule presentations. Tanner stated in her deposition that Hedona "wasn't a supervisor in the traditional sense. . . . [S]he wasn't always aware of exactly what I was doing. She didn't totally keep tabs on every detail. . . ." In sum, there is a factual dispute as to whether Harcourt exercised sufficient control over Tanner's work to make Tanner a servant.

There is also a factual dispute as to whether the other Restatement § 220(2) factors indicate that Tanner is an employee or an independent contractor. For example, a jury could reasonably conclude that Tanner generally works as a teacher, which is distinct from Harcourt's educational publishing business.[15] Tanner responded to an advertisement in the education section of the newspaper that said "educational publisher needs teacher," and Powell acknowledges that Tanner is a teacher by profession. However, a jury also could reasonably conclude that Tanner's work in demonstrating Harcourt's educational materials to teachers is not sufficiently distinct from Harcourt's principal business of selling educational materials, since Tanner's demonstrations could be considered essential to achieving sales. Indeed, the per diem contract between the parties indicates that Tanner was hired to "sell[ ] all

13. *Hammond v. Bechtel, Inc.*, 606 P.2d 1269, 1275 (Alaska 1980); *see also* RESTATEMENT (SECOND) OF TORTS § 414 cmt. a (1965) ("If the employer of an independent contractor retains control over the operative detail of doing any part of the work, he is subject to liability for the negligence of the employees of the contractor engaged therein, under the rules of that part of the law of Agency which deals with the relation of master and servant.").

14. *See Sterud*, 640 P.2d at 826 (quoting RESTATEMENT (SECOND) OF AGENCY § 220(1) cmt. c (1958)) (providing that while the existence or nonexistence of a master-servant relationship is ordinarily a jury question, "[i]f the inference is clear that there is, or is not, a master and servant relation, it is made by the court").

15. *See* RESTATEMENT (SECOND) OF AGENCY § 220(2)(b) (1958).

Harcourt Brace School Publishers programs . . . ."

A jury also could reasonably conclude that, although Tanner reworked some of her outlines, Harcourt "supplies the instrumentalities [and] tools" for Tanner by providing her with its sample educational materials, which she was required to show to the teachers at her presentations, and with outlines which she could use for her presentations.[16] In addition, Tanner's per diem contract indicates that "Harcourt Brace will own any materials or other contributions prepared by you, including copyright throughout the world, as work-made-for-hire."[17] In addition, Harcourt arguably provided Tanner with "the place of work"[18] by telling her which schools needed in-service presentations.

There is also a factual dispute as to whether Tanner was paid "by the time" rather than "by the job."[19] She earned $125 per day for her work in Anchorage. But Harcourt argues that "the facts clearly suggest that a demonstration would not take more than a day. In effect, Tanner was paid per demonstration." Whether the facts do, in fact, indicate that Harcourt effectively paid Tanner by the job is an issue for the jury. The jury may also consider the evidence that Tanner did not receive a W 2 form from Harcourt. Rather, she received an IRS 1099 form and paid self-employment tax on the $9,000 to $10,000 she earned from her work

for Harcourt in 1997. How much weight to give the method-of-payment factor against other factors also is an issue for the factfinder.[20]

The record indicates that there is a factual dispute over whether Tanner and Harcourt "believe[d] they [were] creating the relation of master and servant."[21] The only employment contract in the record is the independent contractor contract, and Tanner has repeatedly asserted that she considered herself to be an independent contractor when she did work for Harcourt. She also states that although she was representing Harcourt when making presentations, she "didn't have authority to speak for the company." But Powell argues that Harcourt's and Tanner's statements that she "was doing work for Harcourt Brace" and that she was acting within "the scope of her employment" at the time of the accident indicate that she believed she was an employee of Harcourt. However, the fact that Tanner admitted to working for Harcourt says nothing about the nature of their working relationship.[22]

More relevant is Powell's argument that the independent contractor per diem contract does not apply to Tanner's work in Alaska. Tanner's March 1, 1997 "Per Diem Agreement for Independent Contractors" provided that Tanner had been "engaged, on a per diem basis [at $125 per hour], for no more than 16 days . . . [to] sell[ ] all Harcourt

---

16. RESTATEMENT (SECOND) OF AGENCY § 220(2)(e) (1958).

17. The fact that Harcourt owns the materials that Tanner creates would seem to indicate that she is Harcourt's servant. *See* RESTATEMENT (SECOND) OF AGENCY § 220(2) cmt. k (1958) ("The fact that a worker supplies his own tools is some evidence that he is not a servant. On the other hand, if the worker is using his employer's tools or instrumentalities, especially if they are of substantial value, it is normally understood that he will follow the directions of the owner in their use, and this indicates that the owner is a master."). However, the United States Supreme Court has made clear that "a work for hire can arise through one of two mutually exclusive means, one for employees and one for independent contractors." *Community for Creative Non–Violence*, 490 U.S. at 743, 109 S.Ct. 2166.

18. RESTATEMENT (SECOND) OF AGENCY § 220(2)(e) (1958).

19. RESTATEMENT (SECOND) OF AGENCY § 220(2)(g) (1958).

20. At least one court has held that a worker is an independent contractor in spite of evidence that the worker is paid on a per diem basis. *See Soderback v. Townsend*, 57 Or.App. 366, 644 P.2d 640, 642 (1982) (holding that broker was an independent contractor, despite undisputed evidence that he was paid a per diem of $175 plus expenses).

21. RESTATEMENT (SECOND) OF AGENCY § 220(2)(i) (1958).

22. *See Soderback*, 644 P.2d at 643 ("That Townsend may have represented himself as 'working for' Quasar did not present any evidence to dispute Quasar's evidence on its lack of any right to control the means whereby Townsend accomplished his mission for Quasar.").

Brace School Publishers programs in the state of Hawaii." The plain language of this contract covers only sales of Harcourt programs in Hawaii. Thus, a jury reasonably could infer that the contract does not cover the in-service presentations that Tanner conducted in Alaska.[23]

■ In sum, the application of Restatement § 220(2) factors (a), (b), (e), (g), and (i) to the facts of this case does not permit the court to resolve on summary judgment whether there is, or is not, a master and servant relation.[24] Harcourt offered prima facie evidence that it exercised insufficient control over Tanner to create an employer-employee relationship and that the other Restatement factors indicate that Tanner was an independent contractor. Powell also satisfied her burden that there is a genuine issue of material fact by providing evidence from which a jury reasonably could infer that Tanner was an employee.[25] Therefore, we reverse the trial court's partial summary judgment in favor of Harcourt.[26] On remand, the jury must consider the evidence relating to each of the factors and decide how to weigh the factors in determining the nature of the working relationship between

---

**23.** Furthermore, the record suggests that Tanner may have already exceeded the sixteen days of work authorized under the contract. Tanner explained that between March 1, 1997 and August 20, 1997, the day of the accident, she had worked less than twenty days under that contract. However, in her deposition, Tanner stated that she had done approximately ten presentations for Harcourt before the day of the accident.

**24.** *See* Restatement (Second) of Agency § 220(1), cmt. c (providing that although the existence or nonexistence of a master-servant relationship is ordinarily a jury question, "[i]f the inference is clear that there is, or is not, a master and servant relation, it is made by the court."); *see also Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 752–53, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) (holding that sculptor was an independent contractor because "Reid is a sculptor, a skilled occupation. Reid supplied his own tools. He worked in his own studio in Baltimore, making daily supervision of his activities from Washington practically impossible. Reid was retained for less than two months, a relatively short period of time. During and after this time, CCNV had no right to assign additional projects to Reid. Apart from the deadline for completing the sculpture, Reid had absolute freedom to decide when and how long to work. CCNV paid Reid $15,000, a sum dependent on 'completion of a specific job, a method by which independent contractors are often compensated.' Reid had total discretion in hiring and paying assistants. 'Creating sculptures was hardly 'regular business' for CCNV.' Indeed, CCNV is not a business at all. Finally, CCNV did not pay payroll or Social Security taxes, provide any employee benefits, or contribute to unemployment insurance or workers' compensation funds.") (citations omitted).

**25.** *See Sterud v. Chugach Elec. Ass'n,* 640 P.2d 823, 826–27 n. 8 (Alaska 1982) (affirming judgment in favor of the employer as a matter of law based on affidavits submitted by the employer that indicated that it had no control over the manner and means by which construction by the contractor/labor broker was performed, and the injured party offered no evidence to indicate that the employer retained control over details of the labor involved in the construction: "The mere fact that the question as to whether a particular relationship is that of master-servant or employer-independent contractor is ordinarily a factual one does not mean that it cannot be decided by the court on a motion for summary judgment, where the moving party meets its burden and the nonmoving party does not adequately respond.").

**26.** Powell appears to argue that even if Tanner could be considered an independent contractor, Harcourt is vicariously liable for the accident because Tanner is an agent of Harcourt. However, the critical inquiry in determining vicarious liability is whether a master-servant relationship exists; evidence of agency, alone, is insufficient to impose vicarious liability. *See Norris v. Sackett,* 63 Or.App. 762, 665 P.2d 1262, 1262–63 (1983) (holding that a corporation's liability could not be established merely by showing that the motor vehicle operator was an agent of the corporation; the corporation must have been the worker's master and must have had a right to control its servant while carrying out a task for the corporation's benefit; Restatement (Second) of Agency § 250, cmt. a ("It is only when to the relation of principal and agent there is added that right to control physical details as to the manner of performance which is characteristic of the relation of master and servant that the person in whose service the act is done becomes subject to liability for the physical conduct of the actor.").

Powell also asserts that the case law cited by the respondents "does not deal with a company being responsible for acts of an agent against third[ ]parties." However, neither the Restatement nor any decision by this court indicates that an employer may be vicariously liable when an independent contractor injures a third party. Thus, the fact that a third party was injured in this case is irrelevant.

Harcourt and Tanner.[27]

## B. The Striking of Thirty Seven of Powell's Witnesses

### 1. Procedural history relating to motion to strike witnesses

On March 8, 2000, the parties held a planning meeting and agreed on a scheduling order setting trial for June 4, 2001. They agreed to provide each other with preliminary witness lists by June 8, 2000, to complete discovery by February 28, 2001, and to exchange final witness lists by April 4, 2001.

In Powell's initial disclosures dated November 25, 1999, she provided the factual basis for her claims against Tanner, and identified twenty-three witnesses, including eighteen witnesses who would "testify as to the nature of the injury, its relation to the accident, that it may cause permanent problems, and that it will limit Ms. Powell's activities, work, and his [or her] treatment of the same." In her response to interrogatories on March 31, 2000, Powell listed medical bills from more than twenty medical centers and doctors, and stated that future medical bills would be incurred for problems relating to her knee and bladder.

On June 7, 2000, Powell timely filed her preliminary witness list, naming twenty-five witnesses. On March 14, 2001, Powell supplemented her preliminary witness list with one additional witness. In her final witness list, timely filed on April 4, 2001, Powell listed sixty-eight witnesses, including thirty-eight witnesses who had not been named in her preliminary witness list or initial disclosures.

On April 9, 2001, Harcourt moved to strike the new witnesses, arguing that Powell could have identified them at the moment the lawsuit was filed, and that Harcourt would be prejudiced by the addition of these new wit-

nesses because it did not have time to interview them in the two months before trial.[28] Powell responded that the new witnesses were necessary to rebut allegations that Powell was not injured in the accident and that her hotel project, for which she claims financial loss, was not fully in effect at the time of the accident. She further argued that the names of all of the new witnesses were revealed to Harcourt through discovery. On May 31, 2001, the trial court summarily granted Harcourt's motion and struck thirty-eight of Powell's new witnesses.

Powell filed a motion for reconsideration, describing the nature of the testimony to be given by each witness and how their identities were disclosed to Harcourt in discovery. The trial court denied reconsideration in part, ruling that Powell may only "supplement her witness [list] with Dr. Leon Chandler, whom she has identified as her current treating physician."

Powell petitioned for review of the trial court's orders striking certain of her witnesses and entering partial summary judgment against her. We granted this petition as well as the petition challenging summary judgment and consolidated them.

### 2. Standard of review relating to order striking witnesses

■ Powell argues that the trial court erred in striking her witnesses because there is no evidence of " 'willful noncompliance' with court orders, or 'extreme circumstances,' or 'gross violations.' " The choice of a particular sanction for a discovery violation generally is a matter committed to the broad discretion of the trial court, subject only to review for abuse of discretion.[29] Because the court's striking of thirty-seven of Powell's witnesses does not establish the outcome of this case or end the litigation, we need not determine whether the order was justified

27. RESTATEMENT (SECOND) OF AGENCY § 220(1) cmt. c ("The relation of master and servant is one not capable of exact definition. . . . The factors stated in Subsection (2) are all considered in determining the question, and it is for the triers of fact to determine whether or not there is a sufficient group of favorable factors to establish the relation.") (citation omitted).

28. On May 2, 2001, the superior court granted Powell's attorney's motions to withdraw from the case and to continue the June 4, 2001 trial. However, the trial court did not reopen discovery.

29. *Sykes v. Melba Creek Mining, Inc.*, 952 P.2d 1164, 1169 (Alaska 1998).

because of "willful noncompliance" with court orders, "extreme circumstances," or "gross violations" of the Rules, nor must we determine whether the trial court explored alternatives to the sanction.[30]

### 3. We need not decide whether the trial court abused its discretion by striking witnesses because Powell's failure to supplement her disclosure no longer prejudices Harcourt and Tanner.

Powell argues that because there was no "evidence of prejudice, noncompliance with a court order, or bad faith, it was error for the trial court to strike 37 witnesses from Powell's final witness list."[31] Harcourt argues that Powell violated the court's pre-trial order for the parties to file preliminary witness lists and to supplement their initial disclosures every thirty days until discovery closed.

Alaska Rule of Civil Procedure 26(a)(3)(A) requires parties to identify "each witness, separately identifying those whom the party expects to present and those whom the party may call if the need arises." Alaska Rule of Civil Procedure 26(e)(1) provides that after making initial disclosures under Rule 26(a)

[a] party ... is under a duty to supplement or correct the disclosure or response to include information thereafter acquired if ordered by the court or ... if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

Sanctions for noncompliance with these provisions are governed by Alaska Rule of Civil Procedure 37(c)(1):

A party that without substantial justification fails to disclose information required by Rule 26(a), 26(e)(1), or 26.1(b) shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

Powell complied with Rule 26(a) by providing initial disclosures and she complied with the scheduling order's deadlines for filing preliminary and final witness lists. Complicating this case is an anomalous provision in the scheduling order requiring the parties to file their final witness lists after discovery closed. The scheduling order's sequencing of deadlines created a potential conflict over an opposing party's inability to depose witnesses identified for the first time in the final witness list without violating the close of discovery deadline. Nothing in the scheduling order limited the number of witnesses the parties could call or otherwise addressed how to resolve this foreseeable dispute.

On the other hand, Powell's failure to identify the thirty-seven additional witnesses before the close of discovery may have been prejudicial at the time, given the looming June 2001 trial date.[32] However, because we reverse the trial court's order granting summary judgment, a new trial date must be set and discovery will likely be reopened. We therefore need not address whether the trial court abused its discretion because any time pressures that existed in spring 2001 no longer exist and Harcourt will now have time to depose Powell's additional witnesses. Pow-

**30.** *See id.* at 1169–70 ("[T]he trial court's discretion is limited when the effect of the sanction it selects is to impose liability on the offending party, establish the outcome of or preclude evidence on a central issue, or end the litigation entirely. Before extreme sanctions of this kind may properly be imposed, there must be 'willful noncompliance' with court orders, or 'extreme circumstances,' or 'gross violations' of the Rules. The record must also 'clearly indicate a reasonable exploration of possible and meaningful alternatives to dismissal.' ... If meaningful alternative sanctions are available, the trial court must ordinarily impose these lesser sanctions.") (citations omitted).

**31.** The trial court initially struck thirty-eight of Powell's new witnesses, but upon reconsideration, it allowed one of the thirty-eight witnesses to be added to Powell's final witness list. Thus, only thirty-seven witnesses were struck.

**32.** *But see Sigala v. Spikouris,* 2002 WL 721078, 3 (E.D.N.Y.2002) (rejecting the defendant's argument that it should be permitted to depose all witnesses listed on plaintiff's witness list because the argument finds "no support in the Federal Rules of Civil Procedure").

ell's failure to supplement her disclosures will no longer prejudice Harcourt and Tanner.[33]

## IV. CONCLUSION

Reasonable minds could differ as to whether the Restatement (Second) of Agency § 220(2) factors indicate that Tanner was an employee or an independent contractor. Accordingly, we REVERSE the order granting Harcourt partial summary judgment. We also REVERSE the order striking thirty-seven of Powell's witnesses because Powell complied with the scheduling order deadline, and her failure to identify the additional witnesses will not prejudice Harcourt and Tanner in light of our decision to remand the case for trial.

EASTAUGH and CARPENETI, Justices, not participating.

---

**33.** Note that our decision does not preclude Harcourt from seeking an order compelling Powell to furnish a list of witnesses she actually intends to call at trial. *Cf. Matter of Long,* 34 B.R. 85, 87 (Bankr.M.D.Fla.1983) ("[I]t is quite obvious that it is absurd to bombard a litigant with a list of an army of prospective witnesses without specifying which of them will actually testify. In such a situation, the litigant is faced with two choices, both of them unfair. He either takes the chance and guesses which of them will actually testify and depose them or not to take this chance and depose all of them."). Neither does our decision preclude Harcourt from moving to exclude the testimony of any of Powell's witnesses under Alaska Rule of Evidence 403. *See* Alaska R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.").