Shannon PARNELL, Appellant/Cross–Appellee,

v.

PEAK OILFIELD SERVICE CO.; Peak Alaska Ventures, Inc.; and Nabors Alaska Services Corp., Appellees/Cross–Appellants.

Nos. S–11880, S–11896.

Supreme Court of Alaska.

Nov. 9, 2007.

As Modified on Rehearing Jan. 29, 2008.

Michael W. Flanigan, Walther & Flanigan, Anchorage, for Appellant/Cross–Appellee.

Gary A. Zipkin and Susan M. West, Guess & Rudd, Anchorage, for Appellees/Cross–Appellants.

Before: FABE, Chief Justice, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

BRYNER, Justice.

## I. INTRODUCTION

Two vehicles traveling in opposite directions at a curve on the Kenai Spur Highway hit a moose at nearly the same time; the impact killed the moose and left its carcass straddling the centerline. Both drivers left the scene. Soon after, another car rounded the curve, struck the carcass, and ran off the road, seriously injuring one of its occupants. Section 321 of the Restatement (Second) of Torts recognizes that a person whose actions have "created" a hazard owes a duty of due care to protect others from the danger. The main question raised here is whether each of the drivers who initially struck the moose owed a duty of due care on account of creating the hazard, even though only one of them might have actually caused the moose's death. Because the language of section 321 and the public policy underlying that provision favor imposing the duty on both drivers so long as each actively participated in the incident that created the hazard and realized that a substantial danger to others resulted, we conclude that the duty should not be restricted to the driver whose vehicle actually killed the moose.

## II. FACTS AND PROCEEDINGS

### A. Facts

On the morning of April 21, 2002, at about 4:30 a.m., Marvin Dougherty left his home near Nikiski on the Kenai Peninsula for his job at the Swanson River oilfield. The jobsite is about twenty-five miles off the Spur Highway and is accessible only by a rough gravel road. Dougherty, a pipe welder, was driving a 3/4 ton pickup owned by his employer, Peak Oilfield Service Co. Dougherty planned to stop at the Fred Meyer store in Soldotna on his way to the jobsite to pick up several Peak co-workers—a task he performed regularly as a condition of being allowed to use Peak's truck.

At about 4:45 a.m. Dougherty was near milepost six on the highway, driving toward Soldotna; conditions were icy. As Dougherty rounded an unlit curve, traveling about forty-five to fifty miles per hour, he hit a moose that had just been struck and knocked into his lane by an oncoming car. Upon impact, Dougherty's pickup pushed the moose—by then presumably dead—about twenty-five feet down the road and toward the centerline of the highway. Dougherty pulled over briefly to see if his pickup had any road flares or a tow strap but found neither in the truck. Dougherty did not have a cell phone and did not attempt to find a nearby phone to call the police. He decided to drive on to the Soldotna Fred Meyer and to return to the accident scene after telling his co-workers that they would have to make their own arrangements for getting to work. Dougherty later acknowledged that he "made a bad choice" by continuing on to Fred Meyer and that he thought that "the right thing to do ... after striking the moose" would have been to "go back there and put [his] four-ways on and put some flares out, if [he] had some."

The driver of the oncoming car who initially struck the moose also failed to stop, and was never identified. In later proceedings

the parties referred to the unidentified driver as "John Doe."

The moose strike was witnessed by David Poulin, another Peak employee, who happened to be driving behind Dougherty when his truck hit the moose. Poulin saw the unidentified vehicle approaching from the opposite direction and then noticed a moose dart into the road directly in front of it. According to Poulin, the headlights of the unidentified vehicle "kind of went blurry." Poulin did not see the actual impact between the moose and the oncoming vehicle but recalled seeing the moose flying into Dougherty's lane "in a most unnatural position." Poulin also recalled seeing Dougherty's truck swerve, trying to avoid the moose. At the same time, Poulin slammed on his brakes. His vehicle skidded toward the right, almost onto the rumble-strip, but stayed in its lane. By the time he came to a stop, the moose's head lay on the ground slightly in front of his vehicle and just to the left. Poulin then saw Dougherty's truck continue on toward Soldotna.

About fifteen to twenty minutes after Dougherty left the scene, Shawn Moore and his passenger, Shannon Parnell, rounded the same curve on the Kenai Spur Highway; like Dougherty, they were headed toward Soldotna. Both had been drinking at the Rainbow Bar in Kenai, and Moore had offered Parnell a ride home. Moore suddenly saw a "white lump" in his lane of travel. A second or two later, he hit the moose. His truck swerved to the right and into a ditch, where it flipped over, crushing the cab. Parnell suffered serious injuries, which eventually left her quadriplegic. Moore, who was not seriously injured, then ran to a nearby business where a woman agreed to call 911.

Meanwhile, after reaching Soldotna, Dougherty told his co-workers that he needed to return to the accident scene. By the time he retraced his route and returned to milepost six, Kenai Police officers had arrived at the accident scene. After Dougherty contacted them, the officers inspected his truck for damage and found moose flesh and debris hanging from the truck's undercarriage but detected little or no damage above the front bumper.

## B. Proceedings

Parnell eventually sued Dougherty's employer, Peak Oilfield Service Co., and other related business entities (collectively "Peak"). She claimed that Dougherty had been negligent in failing to remove the moose from the highway or warn other drivers of the hazard and that Peak was vicariously liable for Dougherty's actions because Dougherty had been acting in the course of his employment at the time of the collision.

Both parties moved for summary judgment on the issue of Dougherty's alleged negligence; Parnell also moved for partial summary judgment declaring that Peak would be vicariously liable for Dougherty's conduct if he were found to have acted negligently. Peak conceded that if Dougherty created the hazard on the highway, he would have been negligent in failing to warn other drivers or remove the hazard. But Peak argued that the unknown driver who first struck the moose was solely responsible for creating the hazard because it was that vehicle that killed or mortally wounded the moose. Peak reasoned that, since Dougherty had not created the hazard, he had no duty to remove it from the highway or to warn other motorists of its presence.

For her part, Parnell claimed that Dougherty was liable on a theory of negligence per se. Alleging that the evidence unequivocally established that Dougherty was on the job when he struck the moose, Parnell also claimed she was entitled to a judgment that, as Dougherty's employer, Peak was vicariously liable for his negligent conduct.

Superior Court Judge Charles T. Huguelet denied both parties' motions for summary judgment on the issue of Dougherty's duty. Judge Huguelet ruled that if Dougherty created the hazard, he owed a duty of due care to protect other motorists from the danger as a matter of law, but that the issue of whether Dougherty actually created the hazard raised disputed questions of fact for the jury. But the judge did grant Parnell's motion for partial summary judgment on the issue of Peak's vicarious liability, ruling as a matter of law that Dougherty was acting within the

course of his employment when his pickup struck the moose.

After trial the jury returned a verdict in Peak's favor, finding that Dougherty had not been negligent. The superior court entered final judgment in Peak's favor, denying Parnell's motions for directed verdict and for judgment notwithstanding the verdict.

Parnell appeals. Peak cross-appeals.

## III. DISCUSSION

### A. Parnell's Appeal

#### 1. Failure to instruct on Parnell's theory that both drivers participated in creating the hazard

As already mentioned, the superior court ruled before trial that if Dougherty created a hazardous condition on the highway, he owed a duty of due care to remove the hazard or warn other motorists of the danger but also ruled that whether Dougherty actually created the hazard raised disputed questions of fact for the jury. This ruling comports with section 321 of the Restatement (Second) of Torts, which states: "If the actor does an act, and subsequently realizes or should realize that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect." [1]

On appeal, Parnell argues that the superior court erred in refusing to instruct that Dougherty and the driver of the oncoming car—John Doe—both owed a duty of due care if they both participated in creating the hazard. Before considering this argument or Peak's response, we must briefly describe its factual and procedural background.

After the superior court ruled that the issue of duty was governed by a standard similar to the one set out in Restatement Section 321, Parnell submitted a proposed instruction seeking to inform the jury that a duty of due care arises "if a driver, *by his actions, or in combination with others, creates or participates in the creation of a hazard* in a roadway." (Emphasis added.) The court declined to give Parnell's proposed instruction, and instead simply instructed the

jury that Dougherty owed a duty of due care if he "created a hazard or hazardous condition on the highway."

The issue of joint participation in creating a hazard surfaced again after the jury began its deliberations. The court received a note from the jury foreperson seeking to clarify the jury instructions defining negligence. The note specifically focused on the last paragraph of Instruction No. 23. That paragraph and the one immediately before it described the elements of duty and breach that the jury needed to find in order to hold Peak liable for Parnell's damages or, conversely, to absolve Peak of negligence:

> If you find it is more likely true than not true that Marvin Dougherty created a hazard or hazardous condition on a highway, then Marvin Dougherty had a duty to take reasonable actions to remove the hazard or warn others of its presence. If you find that Marvin Dougherty created a hazard or hazardous condition on a highway and failed to take reasonable actions to remove the hazard or warn others of its presence, then you must find that Peak was negligent.

> If, on the other hand, you find that Marvin Dougherty did not create a hazardous condition on a highway then you must find that Peak was not negligent. OR, if you find that Marvin Dougherty created a hazardous condition AND took reasonable actions to remove the hazard or warn others, then you must find that Peak was not negligent.

In light of the jury note seeking to clarify the last of these two paragraphs, Parnell renewed her earlier request for a supplemental instruction to inform the jury that a hazard could be created by the combined actions of more than one driver; specifically, Parnell proposed to answer the jury's question with a supplemental instruction stating:

> A person creates a hazard on the roadway if they strike a moose and either directly or in combination with another vehicle striking the moose cause the moose to become a hazard in the roadway, even if

1. RESTATEMENT (SECOND) OF TORTS § 321 (1965).

the striking of the moose [occurred] due to no fault of the motorist.

The superior court declined to give the supplemental instruction, electing instead to respond to the jury's note by simply referring back to the original instructions defining "negligence" and "a hazard or hazardous condition on a highway." The court's response stated: "Marvin Dougherty had a duty to act with reasonable care as defined in Instruction 21 if he created the hazardous condition on the highway as defined in Instruction 25."

Parnell now asserts that an instruction on the issue of joint creation was crucial because undisputed evidence showed that Dougherty's truck and the John Doe vehicle were involved in "near simultaneous collisions with the moose." Parnell reasons that, although these circumstances make it clear that both vehicles substantially contributed to the moose's presence on the highway, the precise extent of each vehicle's contribution to the hazard remained unknowable, thus precluding any definitive determination as to which vehicle actually killed or disabled the moose. Parnell takes the position that the jury reasonably could have found that both drivers participated in creating the hazard and that both owed a duty of due care toward other motorists. Parnell faults the trial court for declining to give the instruction she proposed before trial and the supplemental instruction she proposed in response to the jury's post-trial request for clarification of Instruction 23. She insists that, by failing to clarify the meaning of "created a hazard," the instructions became "highly misleading" because they left the jury with the false impression that it faced an "all or nothing" choice as to which driver actually killed or mortally wounded the moose. In Parnell's view, then, the court's failure to give her proposed supplemental instruction deprived her of the right to inform the jury of her theory of the case.

Peak responds that the court correctly instructed the jury that Dougherty had a legal duty to remove the moose or warn others of its presence only if Parnell proved that Dougherty "created the hazard" himself by actually killing or mortally wounding the moose. In effect, then, Peak insists that the jury was properly told that Dougherty owed no duty to protect Parnell from harm unless the jury found that he was the actual, or but-for, cause of the moose's presence on the highway. In Peak's view, a "joint participation" instruction like the one proposed by Parnell would unjustifiably expand the Restatement's duty by imposing potential liability on any driver who happened to run over an animal carcass, unless the driver stopped and proceeded to remove the hazard or warn other motorists of its presence.

■ Peak's response to Parnell's argument mistakenly shifts the focus of the inquiry to whether the moose had already been sufficiently disabled so as to be an *existing* hazard when Dougherty struck it. But what is at issue here is not who caused the moose's carcass to be in the road, but rather who had the duty to warn the public of the hazard thus created. Generally, the law of torts imposes no duty on a person to protect others from harm by a third party.[2] But as we have recognized in earlier cases,[3] section 321 of the Restatement (Second) of Torts carves out an exception to this rule by imposing a duty of care when an "actor does an act, and subsequently realizes or should realize that it has created an unreasonable risk of causing physical harm to another."[4]

The controversy here turns on the precise meaning of section 321's language requiring that the actor's act must have "created" the ensuing danger. Because the proper interpretation of "created" raises a question of duty, we must answer this question by focusing on the protective policies underlying section 321, not by supporting an analysis designed to decide issues of proximate cau-

---

2. *See, e.g., Bryson v. Banner Health Sys.*, 89 P.3d 800, 804 (Alaska 2004); *Dore v. City of Fairbanks*, 31 P.3d 788, 793 (Alaska 2001).

3. *See Bryson*, 89 P.3d at 804 n. 8 (noting that section 321 creates an exception to the usual rule

that no duty exists to protect others from harm by third persons).

4. Restatement (Second) of Torts § 321.

sation.[5] On prior occasions we have emphasized that "duty is at heart a question of policy centering on the basic relationship between the parties rather than on the nature of their conduct on a given occasion. Particular conduct becomes important only when a duty is imposed[.]"[6]

Here Peak has argued that section 321 should be construed to mean that the danger posed by the moose carcass's presence on the highway could have been "created" only by the driver whose vehicle actually killed or disabled the moose. In our view, Peak's attempt to equate the creation of a hazard with what amounts to the requirement of but-for causation unduly restricts the scope of the duty contemplated by section 321 and undermines that provision's basic purpose.

As the facts of this case illustrate, hazardous conditions can often reflect the actions of multiple actors. In such cases, however, the immediate circumstances surrounding the hazard's creation will frequently make it difficult to tell exactly which actor and actions primarily caused the new danger; and in many such cases, definitive proof of actual or primary causation might never be found.

In these situations, a rule that hinges the hazard-creating actors' duty of due care on proof of but-for causation would invite all involved actors to disclaim any duty until the question of causation could be resolved. The purpose of the duty established in section 321 is to encourage immediate efforts to avoid future harm. It would make little sense, and would frustrate the duty's purpose, to interpret section 321 as hinging the imposition of the duty on causational determinations that commonly require careful investigation and often prompt considerable debate.

Nor does the plain language of section 321 compel such a narrow definition of its phrase referring to an act that creates a hazard. The section describes two key ingredients required to establish creation. The first is affirmative action on the part of the actor: the duty can attach only when the "actor does an act."[7] The second is the actor's awareness (objectively measured) of a substantial potential for resulting danger: the duty can attach only when the actor "realizes or should realize" that "an unreasonable risk of causing physical harm to another" has resulted from the act.[8] As section 321's own text describes its creation requirement, then, a hazard can be "created" by multiple actors when each actor actively participates in the circumstances immediately surrounding the creation of a hazard and each actor realizes that these circumstances have resulted in a condition that poses a substantial risk of physical harm to others.

Peak advances no sound reason for limiting section 321's duty in cases involving multiple actors to the actor who can be proved to be the but-for cause of the hazard. Although Peak insists that Parnell's joint-creation theory would require any driver who hit a carcass to stop and remove it or warn others of its presence, Parnell actually advances, and the evidence supports, a much narrower theory. At trial it was undisputed that Dougherty and the "John Doe" driver both struck the moose, which at some point in time came to rest in the middle of the roadway, and the evidence, including eyewitness testimony, indicated that the two drivers hit the moose almost simultaneously. Indeed, the superior court itself recognized that the evidence would have allowed the

---

**5.** *See, e.g., Bolieu v. Sisters of Providence in Washington,* 953 P.2d 1233, 1241 (Alaska 1998) ("[F]act-intensive inquiries pertain to the issues of breach, causation, and damages, not the threshold legal question of whether a duty exists.").

**6.** *Mesiar v. Heckman,* 964 P.2d 445, 448–49 (Alaska 1998); *see also City of Kotzebue v. McLean,* 702 P.2d 1309, 1313 (Alaska 1985) (quoting WILLIAM L. PROSSER, THE LAW OF TORTS § 53, at 325 (4th ed.1971), for the proposition that duty "is only an expression of the sum total of those considerations of policy which lead the law to

say that the particular plaintiff is entitled to protection"); *cf.* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 53, at 356 (5th ed. 1984) ("It is better to reserve 'duty' for the problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other, and to deal with particular conduct in terms of a legal standard of what is required to meet the obligation.").

**7.** RESTATEMENT (SECOND) OF TORTS § 321.

**8.** *Id.*

jury to find that "a combination of the two cars ... took out the moose."

In light of this evidence, the point at issue here is not whether a motorist who happens to see—or merely run over—an already existing roadway hazard can be found to have "created" the hazard. Rather, Parnell's theory of the case presents a more limited question: who bears the duty when two motorists both take substantial actions that combine to create the hazard? In this unique situation, as we have noted, the crucial policy issue becomes whether the protective duty imposed by section 321 should fall to both drivers based on their active participation and actual awareness of resulting danger, or just to the driver who, in retrospect, might be determined to be the primary cause of the hazard's existence. In our view, the policies underlying section 321 weigh heavily in favor of imposing the duty on both drivers.

In arguing for a narrower interpretation of section 321, Peak relies on *Udy v. Custer County*,[9] which simply recognizes the general principle that a motorist who passes by an existing roadway hazard owes no duty.[10] *Udy* is unremarkable, and Peak's reliance on it is misplaced. In contrast, Parnell cites two cases that offer substantial guidance on this question: *Zylka v. Leikvoll*[11] and *Montgomery v. National Convoy & Trucking Co.*[12] Like Parnell's case, both *Zylka* and *Montgomery* addressed situations involving traffic hazards arising from the combined actions of two motorists; in each case, the court recognized that the defendant's substantial participation in creating the hazard sufficed to trigger a duty of due care even though the same hazard arguably might have existed without the defendant's participation.[13]

On balance, considering the record, the parties' arguments, and these authorities, we conclude that when the combined actions of two actors result in a hazardous condition, section 321 allows each to be treated as having "created" the hazard so long as each actor's conduct substantially contributed to the resulting hazard and each actor realizes the resulting danger of serious harm to others.

▇ We also conclude that Parnell was entitled to an instruction to clarify the scope of the disputed duty. We have previously recognized that a plaintiff is generally entitled to a jury instruction "consonant with the theory of her case" if the evidence supports the plaintiff's theory.[14] We have further recognized that, when a jury expresses confusion and seeks clarification as to the applicable law, it is the trial court's duty to guide the jury with a "lucid statement of the relevant legal criteria."[15]

Here, Parnell's primary theory of liability against Peak was her theory of joint creation: she claimed that John Doe and Dougherty both struck the moose within moments of each other and left its carcass on the highway, that Dougherty realized that the carcass exposed other motorists to a substantial risk of harm, and that these circumstances justified assigning a duty of due care to Dougherty because he had participated in creating the hazard. In keeping with this theory, Parnell proposed an instruction describing her claim as being that "Marvin Dougherty struck a moose, thereby creating or participating in the creation of a hazardous situation." Her instruction also proposed to inform the jury that under the law applicable to the case, a duty of due care arises "if a driver, by his actions, or in combi-

9. *Udy v. Custer County,* 136 Idaho 386, 34 P.3d 1069 (2001).

10. *Id.*

11. *Zylka v. Leikvoll,* 274 Minn. 435, 144 N.W.2d 358 (1966).

12. *Montgomery v. Nat'l Convoy & Trucking Co.,* 186 S.C. 167, 195 S.E. 247 (S.C.1938).

13. *See Zylka,* 144 N.W.2d at 367; *Montgomery,* 195 S.E. at 253.

14. *Clary Ins. Agency v. Doyle,* 620 P.2d 194, 201 (Alaska 1980) (quoting *Putensen v. Clay Adams, Inc.,* 12 Cal.App.3d 1062, 91 Cal.Rptr. 319, 334 (1970)).

15. *Chenega Corp. v. Exxon Corp.,* 991 P.2d 769, 776 (Alaska 1999); *Des Jardins v. State,* 551 P.2d 181, 189–90 (Alaska 1976) (quoting *Bollenbach v. United States,* 326 U.S. 607, 612–13, 66 S.Ct. 402, 90 L.Ed. 350 (1946)).

nation with others, creates or participates in the creation of a hazard in a roadway."

In our view, by emphasizing that a duty of due care can be owed by a driver who either "creates" a hazard individually or "participates in the creation" with another driver, Parnell's proposed instruction effectively made the point that both Dougherty and John Doe could be found to have created the hazardous condition, even though the same hazard might have existed if only one or the other had struck down the moose.

The trial court's instructions did not otherwise make this point. In keeping with Peak's narrow view of section 321's creation requirement, the instructions actually given by the trial court appeared to offer the jury an either-or choice: on the one hand, Instruction 23 informed the jury of Parnell's claim that Dougherty had created the hazardous condition and stated that she could prevail against Peak only if she proved that Dougherty created the hazardous roadway condition; on the other hand, Instruction 24 told the jury of Peak's claim that "John Doe" had created the hazard, directing the jury to find John Doe negligent if Peak proved this theory.

The jury may have understood these instructions to imply that only one actor could have legally created the hazard. The instructions effectively validated Peak's position that section 321's creation requirement hinged on a finding that Dougherty was the but-for cause of the moose carcass's presence on the highway. Peak maintained in its closing argument that the jury could find that Dougherty created the hazard only if Parnell proved that John Doe's vehicle had neither killed nor mortally wounded the moose. By contrast, although the instructions did not completely prevent Parnell from arguing joint creation, her attorney was constrained to confine this argument to the narrow theory that both drivers might have hit and killed the moose simultaneously—a theory that would have required the jury to find that

both drivers were the actual cause of the hazard because they killed the moose at the same moment.

Even when the jury later requested clarification of Instruction 23's final paragraph, which barred the jury from finding Peak negligent unless it found that Dougherty had himself created the hazard, the trial court declined Parnell's request to inform the jury that Dougherty could have created a hazard "either directly or in combination with another vehicle." Accordingly, the jury was never adequately informed that Dougherty could be found to have "created" the hazard even if his own actions might not actually have killed or incapacitated the moose.

In determining whether the jury was properly instructed on the applicable law, we review the trial court's rulings de novo.[16] An instruction that sets out an incorrect or incomplete statement of the applicable law amounts to reversible error only if it causes substantial prejudice to a party—that is, only "if it can be said that the verdict may have been different had the erroneous instruction not been given."[17] When "evaluating whether there has been prejudicial error with regard to jury instructions, the reviewing court must put itself in the position of the jurors and determine whether the error probably affected their judgment."[18]

Applying these principles, we conclude that if the jury instructions had made it clear that but-for causation is not a strict prerequisite to imposing a duty under section 321, the jury may have returned a different verdict. Accordingly, we hold that the failure to instruct the jury on Parnell's theory of the case amounted to reversible error; at a minimum, Parnell's proposed supplemental instruction should have been given in response to the jury's specific request to clarify the meaning of Instruction 23.

### 2. Parnell's Motions for Judgment as a Matter of Law

Before trial Parnell unsuccessfully moved for summary judgment against Peak on the

**16.** *Reich v. Cominco Alaska, Inc.*, 56 P.3d 18, 25 (Alaska 2002).

**17.** *Id.* (quoting *Barrett v. Era Aviation, Inc.*, 996 P.2d 101, 103 (Alaska 2000)).

**18.** *Id.* (quoting *Cable v. Shefchik*, 985 P.2d 474, 479 (Alaska 1999) (internal quotations omitted)).

issue of liability, asserting that she was entitled to judgment as a matter of law on a theory of negligence per se. After the evidence closed at trial, Parnell unsuccessfully moved for a directed verdict and judgment notwithstanding the verdict on the same grounds or, alternatively, on the basis of the common law factors set out in *D.S.W. v. Fairbanks North Star Borough School District.*[19] Parnell now renews these arguments on appeal.[20]

### a. Negligence per se for violating AS 28.35.080

■ Parnell builds her theory of negligence per se around AS 28.35.080(a), a hit-and-run provision that requires any driver involved in an accident that results in death, personal injury, or "total property damage to an apparent extent of $2000 or more" to notify the police or the Department of Public Safety "immediately by the quickest means of communication." In *Ferrell v. Baxter,* we ruled that general traffic laws can "set the standard of a reasonable man and thereby require a finding of negligence in a tort action if the plaintiff can prove that the defendant committed an unexcused violation."[21] But we have also recognized that negligence per se cannot apply in a particular case unless the trial court first determines that "the conduct at issue lies within the ambit of the statute or regulation in question."[22]

■ Here, the superior court ruled that Parnell's negligence per se claim failed to meet this standard, concluding that the requirements of AS 28.35.080 were not "applicable to the fact situation in this case." The court cited two cases for this conclusion, *Wylie v. State* and *Drahosh v. State,* both of which describe the Alaska Motor Vehicle Code's hit-and-run provisions as having two basic purposes: to prohibit hit-and-run driving in order to prevent drivers from escaping liability and to ensure the availability of prompt assistance to motorists in distress.[23]

Parnell contends that AS 28.35.080 was intended to "protect the motoring public [from] any hazards associated with the accident." But we agree with the superior court's decision rejecting this view and conclude that the court correctly relied on *Wylie* and *Drahosh.* Although AS 28.35.080 may well enable the police to protect the public against roadway hazards in many cases, this appears to be a secondary benefit of the hit-and-run statute. If the legislature had viewed roadway hazards as a matter of primary concern, there would have been no obvious reason for it to use the apparent value of property damage as the exclusive measure triggering the duty to report a hazard—an imprecise measure that is bound to result in underreporting when low-damage accidents create obvious hazards and overreporting when high-damage accidents create no hazard.

---

**19.** *D.S.W. v. Fairbanks N. Star Borough Sch. Dist.,* 628 P.2d 554, 555 (Alaska 1981).

**20.** Because the superior court's post-trial rulings effectively superseded its original pre-trial rulings on Parnell's summary judgment motions, we review the court's post-trial rulings rather than its rulings on summary judgment. We review these rulings de novo using a standard similar to the one that applies in reviewing summary judgment rulings, asking "whether the evidence, when viewed in the light most favorable to the non-moving party is such that reasonable persons could not differ in their judgment as to the facts." *K & K Recycling, Inc. v. Alaska Gold Co.,* 80 P.3d 702, 722 (Alaska 2003) (quoting *Ben Lomond, Inc. v. Schwartz,* 915 P.2d 632, 635 (Alaska 1996)); *cf. Nielson v. Benton,* 903 P.2d 1049, 1052 (Alaska 1995); *Bishop v. Municipality of Anchorage,* 899 P.2d 149, 153 (Alaska 1995) (describing standard of review for summary

judgment). Parnell also appeals denial of her motion for directed verdict on the ground that under the *Restatement (Second) of Torts,* section 321, Peak had a duty to either remove the moose from the roadway or warn others of the hazard and his failure to do so entitled Parnell to a directed verdict. But while we have addressed the legal questions of the existence and extent of the duty in this case, the remaining questions of breach and causation are factual issues reserved for the jury at the new trial after remand.

**21.** *Ferrell v. Baxter,* 484 P.2d 250, 259 (Alaska 1971).

**22.** *Osborne v. Russell,* 669 P.2d 550, 554 (Alaska 1983).

**23.** *See Wylie v. State,* 797 P.2d 651, 657 (Alaska App.1990); *Drahosh v. State,* 442 P.2d 44, 48 (Alaska 1968).

In any event, even assuming that protecting the public from traffic hazards fell within the core purpose of AS 28.35.080, the evidence in this case still would not have supported Parnell's claim of negligence per se. Subsection .080(a) requires an accident involving property damage to be reported only when there is "total property damage to an apparent extent of $2000 or more." Here, several invoices and other discovery evidence included with the parties' pre-trial pleadings suggested that Peak made various repairs to Dougherty's pickup and that the total value of the work exceeded section .080's $2,000 threshold.[24] But these documents were largely unexplained, and at least some of the items they listed seem unrelated to Dougherty's collision with the moose. None of the documents were introduced at trial to establish total property damage; indeed Parnell appears to have made no effort to pursue the issue at trial. And undisputed evidence established that virtually all of the damage from the collision occurred on the underside of Dougherty's truck—an area where the damage was hardly "apparent."

Because AS 28.35.080 imposes a duty on drivers to take immediate action after an accident, the provision's requirement that the value of the damage be "apparent" can best be understood as referring to property damage that can be readily detected and evaluated by motorists at an accident scene. Here, even viewing the record in the light most favorable to Parnell, we see no reasonable basis for finding that damages to Peak's truck totaling $2,000 or more should have been "apparent" to Dougherty at the accident scene. Thus, the court correctly ruled

that liability on a theory of negligence per se cannot stand.

### b. Liability based on *D.S.W.* factors

Parnell alternatively contends that the superior court erred in declining to find liability as a matter of law based on the policy factors listed in *D.S.W. v. Fairbanks North Star Borough School District.*[25] But this alternative theory is unavailing. The *D.S.W.* analysis serves to determine whether a common law duty should be recognized where none otherwise exists. For this reason, we have observed in other cases that an analysis under *D.S.W.* becomes appropriate only "[i]n the absence of any other source of a duty of care (imposed, for example, by statute, contract, or doctrine of law)."[26] Here, as we have already seen, the superior court properly determined that the issue of duty in this case was governed by the legal rule set out in section 321 of the Restatement (Second) of Torts. Accordingly, this case provides no occasion to undertake an analysis under *D.S.W.* in search of a new duty.

### B. Peak's Cross–Appeal

Peak raises a contingent cross-appeal, arguing two points of error to be considered only if Parnell's appeal is not affirmed.

#### 1. Vicarious liability

First, Peak challenges the superior court's order granting summary judgment to Parnell on the issue of Peak's vicarious liability for Dougherty's actions. Peak contends that this ruling "ignore[d] the overwhelming factual evidence" showing that Dougherty was

---

24. Parnell bases her argument that the statute's $2,000 threshold was met on the following evidence: Dougherty's deposition testimony that the truck was "pulling real hard to the right or to the left" after the accident and that this forced him to reduce his speed; an undated Peak supervisor's incident report estimating the "direct cost" of equipment damage as $3,800; an April 24, 2004, Peak purchase order for truck parts, including ball joints, serpentine belts, brake pads, and a speed sensor; and deposition testimony by Peak employee Duke Minium that, shortly after the moose collision, the truck's exhaust sounded noisy. Parnell also argues that the value of the dead moose should be included in the property damage total. We find this argument meritless

because, even though a moose arguably might be characterized as property having value, nothing in the record suggests that the value of a moose killed on the highway could ever be "apparent" to a motorist, as required under section .080.

25. *D.S.W.*, 628 P.2d at 555.

26. *Bolieu*, 953 P.2d at 1235; *see also Kallstrom v. United States*, 43 P.3d 162, 167 (Alaska 2002) ("We apply the [*D.S.W.*] factors ... to determine whether an actionable duty of care exists when the facts under consideration are not covered by statute, regulation, contract, or case law.").

not acting in the course and scope of his employment with Peak, as well as established case law requiring that an employee's activities be designed to serve the employer's interests before liability can be imposed. Peak emphasizes that Dougherty was not employed as a crew driver; the accident occurred before Dougherty's normal shift began and at a distance of several miles from the worksite; and Dougherty was not paid for this travel time to and from the jobsite. Citing several cases holding that driving a company-owned vehicle does not necessarily bring an employee's conduct within the course of employment,[27] Peak insists that the facts clearly show that Dougherty was using Peak's truck to further his own interests, not Peak's.

Parnell responds that the superior court properly held that Peak would be vicariously liable if Dougherty were found negligent, because the undisputed facts show that Dougherty was essentially acting as a "bus driver" in furtherance of Peak's interests.

 Under the doctrine of respondeat superior, an employer is liable for the negligent acts or omissions of an employee only if the acts or omissions occur within the course and scope of employment.[28] For purposes of determining whether a particular act occurred in the course and scope of employment we have customarily looked to the standards set out in sections 228 and 229 of the Restatement (Second) of Agency.[29]

Section 228 describes the circumstances required to bring conduct within the scope of employment as well those establishing conduct fully outside that scope:

(1) Conduct of a servant is within the scope of employment if, but only if:

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits;

(c) it is actuated, at least in part, by a purpose to serve the master, and

(d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.[30]

Section 229 elaborates on the circumstances required under section 228 and lists several factors relevant to determining their presence. This section provides that, "[t]o be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized." It then explains that considerations relevant in determining whether an act meets these standards include whether the act is one commonly done by such servants; whether the master has reason to expect that such an act will be done; whether the instrumentality by which the harm is done has been furnished by the master to the servant; and the extent of departure from the normal method of accomplishing an authorized result.[31]

Comment d of section 229 specifically addresses driving that occurs while an employee is going to and from work:

If the master supplies the servant with a vehicle in order that the servant may go to or from work, it is important to ascertain whether the vehicle is supplied primarily for the purpose of assisting the master's work or for the purpose of assisting the employee to perform what is essentially his own job of getting to or from work. The mere fact that the employer supplies a vehicle does not establish that those who avail themselves of it are within the scope

---

27. *See, e.g., Salmon v. Hinojosa,* 538 S.W.2d 22, 23–24 (Tex.Civ.App.1976); *see also* Restatement (Second) of Agency § 229 cmt. d (1958).

28. *Powell v. Tanner,* 59 P.3d 246, 248 (Alaska 2002); *see also* Prosser and Keeton on the Law of Torts § 70, at 501–03 (W. Page Keeton et al. eds., 5th ed.1984).

29. *Luth v. Rogers & Babler Constr. Co.,* 507 P.2d 761, 764–65 n. 14 (Alaska 1973).

30. Restatement (Second) of Agency § 228.

31. Restatement (Second) of Agency § 229.

of employment while upon it, especially if the use is merely casual.[32]

Illustration 13 of section 229 addresses this comment and is squarely on point with this case:

> P employs men to do logging five miles from the nearest habitation. In order to be certain that they arrive on time, P habitually supplies and keeps in repair a truck which his workmen, who live in the nearest town, use in going to and from work. It is driven usually, but not invariably, by the one acknowledged to be the best driver. These facts will support a verdict that in driving to and from work, the driver is within the scope of employment.[33]

■■ While Peak did not pay Dougherty for driving other employees to the Swanson River worksite, it is undisputed that the company allowed Dougherty to have the truck with the understanding that he would use it to commute to the jobsite with his co-employees; it is further undisputed that Dougherty was en route to pick up other workers and drive them to the jobsite when he hit the moose, and that Peak authorized Dougherty to perform this task on a regular basis and derived a significant benefit from Dougherty's willingness to do so. By driving other employees to work each day, Dougherty helped to ensure that they would reach Peak's remote jobsite on time, at the same time reducing traffic and related impacts on the gravel road leading to the jobsite.

As the superior court correctly recognized in applying the Restatement's analysis, these undisputed circumstances establish that, at the time of the accident, Dougherty was acting in the course of his employment with Peak. Although Peak correctly points out that driving an employer-owned vehicle to work is not itself dispositive of the issue, the additional facts here clearly support a finding that Dougherty was acting within the scope of employment. We thus affirm the superior court's order granting summary judgment to Parnell on the issue of Peak's vicarious liability as Dougherty's employer.

### 2. Peak's expert witness

At trial Peak moved for an order allowing its accident reconstruction expert, Michael DiTallo, to supplement his pre-trial report with—and then to testify about—new information DiTallo had just gained from a recently identified witness. The trial court denied Peak's motion. Peak now challenges this ruling, arguing that Peak acted diligently in acquiring the new information; that the evidence had significant value; and that its exclusion resulted in unwarranted prejudice to Peak. In response, Parnell argues that the court properly excluded DiTallo's supplemental report and testimony because the evidence was untimely and would have left her with insufficient opportunity to respond, since her own experts had already testified and left town.

We find it unnecessary to resolve this point on its merits. Parnell's objections to this evidence and the superior court's order declining to allow its admission both appear to have been based on concerns over potential prejudice that might arise if the new information were admitted at the last minute. Because the disputed evidence will not be cause for surprise in future proceedings, we see no reason to expect that the same concerns would prompt the superior court to exclude the evidence on remand. As matters now stand, then, the controversy over the evidence's last-minute admission appears to be moot.[34]

## IV. CONCLUSION

We REVERSE the judgment against Parnell and REMAND for a new trial in accord with this opinion; we AFFIRM the order granting partial summary judgment to Par-

32. *Id.* cmt. d.

33. *Id.* cmt. d, illus. 13.

34. Because parties and the superior court have had no occasion to raise or consider any issue concerning the admissibility of the new evidence besides the fact of its last-minute production, our disposition finding this point moot implies no view as to the ultimate admissibility of this evidence.

nell on the issue of Peak's vicarious liability for Dougherty's conduct.

MATTHEWS, Justice, not participating.