*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| SANDY SULZBACH and ROB SULZBACH, | ) ) Supreme Court No. S-17853 |
| Appellants, | ) ) Superior Court No. 1SI-17-00237 CI |
| v. | ) ) O P I N I O N |
| CITY & BOROUGH OF SITKA and JOHN T. FERRICK, | ) ) No. 7618 – September 16, 2022 |
| Appellees. | ) ) ) |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Sitka, The Honorable M. Jude Pate, Judge.

Appearances: Mark Choate, Choate Law Firm LLC, Juneau, for Appellants. Timothy W. Bowman, Farley & Graves, P.C., Anchorage, for Appellee City & Borough of Sitka. No appearance by Appellee John T. Ferrick.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

WINFREE, Chief Justice.

## I. INTRODUCTION

A city allowed an independent nonprofit organization to host a public event at a city facility. The nonprofit organization arranged for a volunteer to hang decorations in the facility; a decoration fell, injuring an event participant. The injured participant sued the city, but not the nonprofit organization, for negligence. The city brought a

third-party allocation of fault claim against the volunteer. The parties sought summary judgment, and the trial court concluded that, under federal law, the volunteer could not be held financially responsible for the accident and that the city could not be held vicariously liable for the volunteer's actions. The remaining negligence issues were decided at a jury trial; the jury determined that the volunteer and the city had not been negligent and therefore were not liable for the accident. The event participant appeals. As set forth below, we affirm.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Harrigan Centennial Hall is an event facility owned by the City and Borough of Sitka. The City allowed the Alaska Day Organization, an independent nonprofit entity, to host Sitka's 2016 Alaska Day celebration at Centennial Hall without cost. John Ferrick volunteered with the Alaska Day Organization to help decorate Centennial Hall. Ferrick had previously decorated there but it since had been renovated, and he attended a training session with a facility employee that involved "looking at the ceiling and going over the stage lighting and all of the logistics in the new facility[;] . . . one of those items was decorating."

The City provided a mechanical lift that Ferrick used to hang ten cloth lantern decorations, approximately five-and-a-half-pounds each, from the facility's ceiling. While Ferrick was hanging the lanterns, a dance group — including Sandy Sulzbach — rehearsed on the facility's stage. Ferrick temporarily fastened the lanterns, planning to level their height before fixing them more securely, then left the facility for about 15 minutes. While Ferrick was gone a lantern fell, striking Sulzbach's "head and upper back." An ambulance transported Sulzbach to the hospital, where she was diagnosed with a concussion and released.

## B. Proceedings

Sulzbach and her husband sued the City, alleging its negligence caused them harm.[1]  The City then brought a third-party complaint against Ferrick, alleging his negligence was the "sole, direct and proximate cause" of Sulzbach's injuries and seeking to apportion fault accordingly.[2]  Neither Sulzbach nor the City brought a claim against the Alaska Day Organization.

### 1. Summary judgment

Each party moved for summary judgment.[3]  Sulzbach argued that Ferrick was negligent and that the City was vicariously liable for his actions as a matter of law.[4] The City argued that it owed Sulzbach no independent duty (i.e., the City was not negligent) and that it was not vicariously liable for Ferrick's negligence.  Ferrick, self-

---

[1]      Although both Sulzbach and her husband are parties to the litigation, we refer to Sulzbach individually because her husband's claim arises from her injuries.

[2]      *See* AS 09.17.080(a) (requiring apportionment of fault and damages "[i]n all actions involving fault of more than one person, including third-party defendants and persons who have settled or otherwise been released" unless parties agree otherwise).

[3]      *See* Alaska R. Civ. P. 56(c) (stating summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law").

[4]      Sulzbach asserted that she was seeking summary judgment only on the duty and breach negligence issues, as opposed to all four elements of a negligence claim.  *See Regner v. N. Star Volunteer Fire Dep't, Inc.*, 323 P.3d 16, 21 (Alaska 2014) ("[T]o prove [a] negligence claim[, a party] must show that:  (1) the defendants owed him a duty of care, (2) the defendants breached this duty, (3) he was injured, and (4) his injury was the factual and proximate result of the defendants' breach.").  This distinction is irrelevant to consideration of this appeal.

represented, argued that he was not negligent and that he was shielded from liability by the federal Volunteer Protection Act of 1997.[5]

The trial court concluded that there were genuine issues of fact precluding summary judgment about whether the City owed Sulzbach a duty of care and whether Ferrick owed Sulzbach a duty of care and breached it. But the trial court concluded as a matter of law that the City could not be held vicariously liable for Ferrick's negligence, if any, because Ferrick and the City had "no predicate contractor-contractee relationship." The court reasoned that Ferrick was affiliated only with the independent nonprofit Alaska Day Organization and that his work did not benefit the City. The court also agreed with Ferrick that the Volunteer Protection Act shielded him from liability for ordinary negligence, but the court noted that at trial the City could allocate fault to "Ferrick as a person 'otherwise released from liability' under AS 09.17.080(a)."

### 2. Trial

The trial court's summary judgment decision prohibited recovery from Ferrick and any argument that the City was vicariously liable for Ferrick's actions; at a jury trial Sulzbach thus argued almost exclusively that the City was negligent. The City argued that it was not negligent, implying that any negligence was attributable to Ferrick. Ferrick testified at trial, but he did not participate at the trial as a party.

Sulzbach primarily testified about events after the lantern fell and the extent of her injuries. She conceded having seen Ferrick using the mechanical lift, but she said that she did not think the lanterns were dangerous and that no one warned her about Ferrick's activities.

---

[5] *See* 42 U.S.C. § 14503(a) ("Except as provided . . . , no volunteer of a nonprofit organization . . . shall be liable for harm caused by an act or omission of the volunteer on behalf of the organization [in given conditions] . . . .").

Ferrick testified about his volunteer relationship with the Alaska Day Organization and about hanging the decorations; he said that he had hung decorations at Centennial Hall several times, although not since the facility renovation, and that his wife usually helped him. Ferrick said he initially hung the lanterns using a temporary fastening system so that he could more easily level their height before securing them. Ferrick asserted that the temporary placement of the lanterns "was secure[] under normal circumstances," but he "speculat[ed]" that a strong wind may have dislodged one.

Ferrick also testified about the dance group. Ferrick said that the dancers initially were close to the stage while he was working and that they mostly stayed there, out of his way. Ferrick said that he never warned the dancers about being under the lanterns. Ferrick said that he was out of the room when the lantern fell and that it was only after he returned that he learned the dancers had moved under the lanterns.

Donald Kluting, Centennial Hall's manager, testified during both sides' evidentiary presentations. The trial court initially did not allow Sulzbach to ask Kluting leading questions. The court later reconsidered, and it allowed leading questions during Sulzbach's re-direct examination of Kluting. Kluting estimated that the bottom of the lanterns hung less than eight feet from the ground and that he could nearly reach them with an outstretched arm. He said the lanterns were "lightweight," "collapsible," had no "sharp points," and their shape made it unlikely that all of a lantern's mass would fall directly on someone's head. Kluting testified that the lanterns probably did not present a "dangerous condition" and that it was "debatable" whether the decoration could hurt anyone. Kluting stated that he thought the risk of injury from Ferrick's hanging method was within reasonable "safety margins." Kluting said that the dancers were specifically told someone would be hanging decorations and "informed to stay out from underneath" the lanterns. He also said that some "dancers . . . told [him] that they had been warned" about being under the lanterns.

The Centennial Hall building supervisor testified that he did not know until Ferrick arrived that decorating would take place and had not consulted with Ferrick in detail about hanging the lanterns. He said that he did not remember talking to the dancers before the incident and that the dancers did not affirmatively "indicate [to him] that they knew that they should not be in the area where [Ferrick] was working." A Centennial Hall employee testified generally about responding to the incident. She also testified that the building manager had warned the dancers not to sit near where Ferrick was working and that another lantern had fallen prior to the lantern that struck Sulzbach.

One member of the dance group testified that she did not remember being warned about Ferrick's activities but also that it was "pretty obvious" he was hanging decorations. She said that when the lantern fell she was sitting inches from Sulzbach and that they were 10 to 20 feet from the stage. The dancer explained that the falling lantern also had struck her without causing long-term injuries. A second dancer testified that Ferrick was working toward "the back of the room," away from the stage, when the decoration fell. She said that a Centennial Hall employee had at one point told her to move "because they're going to be hanging the decoration." She said that Ferrick was "fine" with where she was but that after the warning the dancers moved closer to the stage before later moving back under the lanterns once they thought Ferrick's work was complete. She said she did not perceive "any danger" sitting under the decorations. A third dancer testified that Centennial Hall staff told some members of the dance group to move because "[y]ou can't be sitting there while [Ferrick is] hanging above you." She said that dancers moved closer to the stage and away from Ferrick in response to the warning but that they moved back under the lanterns once they believed Ferrick's work was done.

The jury decided neither Ferrick nor the City was negligent.

### 3. Motions for new trial

Sulzbach sought a new trial.[6] Sulzbach argued that the jury verdict finding Ferrick not negligent was against the clear weight of the evidence.[7] She also argued that the trial court made "a fundamental evidentiary error" by initially not allowing her to ask leading questions of Kluting, an adverse witness.

The trial court ruled that sufficient evidence supported the jury finding that Ferrick was not negligent. The court observed that the decorations were light and collapsible and that "it was extremely unlikely" a decoration's full five-and-a-half-pound mass "would concentrate on a single point[,] . . . substantially reducing [its] impact." The court noted Kluting's and Ferrick's testimony "that they did not believe the manner in which the decorations were hung posed any real risk" and "that the [d]ancers had been repeatedly told to not sit beneath the decorations while Ferrick was working." Acknowledging "the jury heard conflicting evidence on the question of Ferrick's negligence," the court ultimately concluded ample evidence supported the jury's verdict that temporarily securing the decorations "was reasonable under the circumstances."

The trial court also concluded that its initial decision to not allow Sulzbach to ask Kluting leading questions was not grounds for a new trial. The court originally had prohibited Sulzbach from asking Kluting leading questions during direct examination. During a break in Kluting's cross-examination the court acknowledged

---

[6] *See* Alaska R. Civ. P. 59 (allowing new trial "in the interest of justice").

[7] *See Hogg v. Raven Contractors, Inc.*, 134 P.3d 349, 352 (Alaska 2006) ("[A] trial court may set aside a verdict and order a new trial in the interest of justice if the verdict is against the weight of the evidence. . . . [T]he court must use its discretion and independently weigh the evidence." (quoting *Kava v. Am. Honda Motor Co.*, 48 P.3d 1170, 1176 (Alaska 2002) (footnotes omitted))). As we later discuss, Sulzbach did not request a new trial on grounds that the verdict in the City's favor was against the clear weight of the evidence (as she contends on appeal).

that it should have allowed Sulzbach to ask leading questions because Kluting was an adverse witness by virtue of his employment with the City.[8] The court then allowed Sulzbach to ask leading questions during re-direct examination. The court concluded that any prejudice to Sulzbach was "minimal" because she had "sufficient opportunities to elicit testimony" and she could not "point to any favorable information that [she was] unable to elicit."

The trial court denied Sulzbach's requests for a new trial.

### 4. Appeal

Sulzbach appeals, contending that the trial court erred by ruling that the City could not be held vicariously liable for Ferrick's negligence, if any, and by not granting her summary judgment motion on Ferrick's negligence. Sulzbach also contends the trial court abused its discretion by not granting a new trial, renewing her arguments that: (1) the trial court prejudiced her by initially refusing to allow her to ask Kluting leading questions and (2) the jury's verdict in favor of Ferrick was against the clear weight of the evidence. Sulzbach also adds a new claim, arguing that the jury erred by deciding, against the clear weight of the evidence, that the City was not negligent.

## III. STANDARD OF REVIEW

"We review a grant of summary judgment de novo, 'affirming if the record presents no genuine issue of material fact and if the movant is entitled to judgment as a

---

[8] Alaska R. Evid. 611(c) ("On direct examination, leading questions should not be allowed except . . . when the witness is hostile, an adverse party, or identified with an adverse party . . . .").

matter of law.' "[9] Denial of summary judgment based on the existence of a genuine issue of material fact usually is unreviewable following a trial on the merits.[10]

We review the decision denying a new trial for abuse of discretion.[11] When the trial court refuses to grant a new trial because a jury verdict is not against the weight of the evidence, we view the evidence in the light most favorable to the non-moving party and "will affirm [the denial] if there is an evidentiary basis for the jury's decision."[12] We "will . . . reverse a decision to deny a new trial [only] 'if the evidence supporting the verdict was so completely lacking or slight and unconvincing as to make the verdict plainly unreasonable and unjust.' "[13]

## IV. DISCUSSION

### A. The Trial Court Did Not Err By Granting The City Partial Summary Judgment On The Ground That It Could Not Be Held Vicariously Liable For Ferrick's Actions.[14]

---

[9] *Kelly v. Municipality of Anchorage*, 270 P.3d 801, 803 (Alaska 2012) (quoting *Beegan v. State, Dep't of Transp. & Pub. Facilities*, 195 P.3d 134, 138 (Alaska 2008)).

[10] *Larson v. Benediktsson*, 152 P.3d 1159, 1169 (Alaska 2007).

[11] *Kava*, 48 P.3d at 1173.

[12] *Hogg*, 134 P.3d at 352 (quoting *Glamann v. Kirk*, 29 P.3d 255, 259 (Alaska 2001)).

[13] *Id.* (quoting *Grant v. Stoyer*, 10 P.3d 594, 596 (Alaska 2000)).

[14] The City contends this argument is moot because the jury found Ferrick was not negligent. *See Ulmer v. Alaska Rest. & Beverage Ass'n*, 33 P.3d 773, 776 (Alaska 2001) (noting that we will "refrain from deciding questions where the facts have rendered the legal issues moot" (quoting *O'Callaghan v. State*, 920 P.2d 1387, 1388 (Alaska 1996) (internal quotation marks omitted))). According to the City, even if it were vicariously liable for Ferrick's actions, he committed no tort. We have disregarded

(continued...)

Principal-agent relationships can give rise to vicarious liability,[15] and two types of potential agency relationships are relevant to this case: servants and independent contractors.[16] "The existence . . . of a master-servant relationship is ordinarily a jury question" but may be decided by a court if "the inference is clear that there is, or is not, a master and servant relation."[17] We have outlined ten factors that

---

[14]    (...continued)
as "irrelevant" vicarious liability claims after a jury found an alleged employee not negligent, but we decline to do so in this case. *See, e.g.*, *Baker v. Werner*, 654 P.2d 263, 267 n.6 (Alaska 1982) ("Given the finding that neither the doctor nor the hospital was negligent, any theory of vicarious liability is irrelevant.").

Sulzbach contends the trial likely would have been litigated differently had the trial court not initially determined the City could not be vicariously liable. The court simultaneously decided three things: (1) the City could not be vicariously liable; (2) Ferrick could not be liable for his own negligence; and (3) the City potentially could apportion fault to Ferrick under AS 09.17.080(a). Sulzbach argues that not being able to recover from Ferrick put her in the uncomfortable position of affirmatively avoiding any suggestion he was negligent, likely her strongest argument, and that this trial strategy might have influenced the jury to Sulzbach's detriment. We thus consider the issue before considering the jury's determination that Ferrick was not negligent.

[15]    *See Powell v. Tanner*, 59 P.3d 246, 248-250, 252 n.26 (Alaska 2002).

[16]    "A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control." *Id.* at 249 (quoting RESTATEMENT (SECOND) OF AGENCY § 220 (AM. L. INST. 1958)). "An independent contractor is 'any person who does work for another under conditions which are not sufficient to make him a servant of the other.' " *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 409, cmt. a (AM. L. INST. 1965)).

[17]    *Sterud v. Chugach Elec. Ass'n*, 640 P.2d 823, 826 (Alaska 1982) (quoting RESTATEMENT (SECOND) OF AGENCY § 220, cmt. c to subsection (1) (AM. L. INST. 1958)).

courts may consider when determining whether someone is an independent contractor;[18] a principal's control over the manner of an agent's work is the most important factor.[19] A principal usually is vicariously liable for a servant's tortious activity[20] but not an independent contractor's.[21] A principal may, however, be vicariously liable for an independent contractor's tort if the principal "entrusts to an independent contractor construction, repair, or other work on the land."[22]

Sulzbach contends that the City is vicariously liable for Ferrick's activity because: (1) Ferrick and the City formed a master-servant relationship and (2) Ferrick was an independent contractor on the City's behalf.[23]

---

[18] *Id.* at 826 & n.6 (adopting factors listed in Restatement).

[19] *Anderson v. PPCT Mgmt. Sys., Inc.*, 145 P.3d 503, 507-08 (Alaska 2006).

[20] *Kastner v. Toombs*, 611 P.2d 62, 63 (Alaska 1980) ("Under the doctrine of respondeat superior a master is liable for the torts of his servants committed while acting in the scope of their employment.").

[21] *See Patton v. Spa Lady, Inc.*, 772 P.2d 1082, 1083 (Alaska 1989) ("The general common-law rule . . . is that an employer is not vicariously liable for the torts of its independent contractor.").

[22] *See id.* at 1083-84 (quoting RESTATEMENT (SECOND) OF TORTS § 422 (AM. L. INST. 1965)).

[23] Sulzbach bases her arguments on the Restatement (Second) of Agency (Am. L. Inst. 1958) and Restatement (Second) of Torts (Am. L. Inst. 1965). Sulzbach does not ask us to apply later versions of the Restatements, but we see nothing that would change our result or reasoning. The Restatement (Third) of Agency explains that the authors moved away from the term "independent contractor" because it does not acknowledge that an independent contractor may nevertheless be an agent. § 1.01, cmt. c (AM. L. INST. 2006). It eschews the term in favor of making a distinction between agents who are not employees and "nonagent service providers." *Id.* The Restatement (Third) of Torts explains that the vicarious liability rules for those hiring independent contractors

(continued...)

### 1. Ferrick was not the City's servant.

Master-servant relationships often involve formal contracts or agreements. But "[o]ne who volunteers services without an agreement for or expectation of reward may be a servant of the one accepting such services."[24] Sulzbach concedes that Ferrick and the City had "no contract or direct agreement." She instead argues that Ferrick was the City's servant because he volunteered his services and the City accepted them.

We have suggested that a predicate to accepting work is that "the [actual] purpose of the service" must be to benefit the principal.[25] But Ferrick's actual purpose was not to benefit the City; Ferrick worked exclusively at the direction of the Alaska Day Organization to fulfill its — not the City's — goals. Had Ferrick not volunteered to decorate, the Alaska Day Organization, not the City, presumably would have found another volunteer. Alaska Day celebration ticket sale proceeds went directly to the Alaska Day Organization. The City collected no rent from the Alaska Day Organization. The only party receiving a direct material benefit from Ferrick's work was the Alaska Day Organization.

---

[23] (...continued)
are "consistent with" the earlier version. § 57, cmt. a (AM. L. INST. 2012). We have not been asked to adopt new terminology and do not do so here.

[24] RESTATEMENT (SECOND) OF AGENCY § 225 (AM. L. INST. 1958); *Anderson*, 145 P.3d at 508 n.8 (citing § 225 in stating that "gratuitous acts may sometimes create a master-servant relationship").

[25] *Anderson*, 145 P.3d at 508 n.8. In *Anderson* we quoted an example from the Restatement (Second) of Agency to make this point: "[I]f a car is stalled in traffic and another driver gets out . . . to assist in pushing the car to the curb, such driver is presumably not a servant of the owner of the first car if [the] purpose is to remove an obstruction to [the driver's] own progress down the street." *Id.* (quoting RESTATEMENT (SECOND) OF AGENCY § 225, cmt. b (AM. L. INST. 1958)).

Moreover, the City did not control the "physical details as to the manner of" Ferrick's work.[26]  City staff trained Ferrick about proper hanging methods in the renovated facility, gave him permission to be at Centennial Hall, and had the ability to stop him from working, but the City did not tell Ferrick which decorations to hang, when to hang them, or how to arrange them.  That the alleged principal "has merely a general right to order the work stopped or resumed" does not create a master-servant relationship.[27]  Neither Ferrick nor the relevant City employees appear to have believed they were creating a master-servant relationship, and Ferrick affirmatively stated that he was volunteering with the Alaska Day Organization.  To the extent the City exercised minimal control over Ferrick, it was general and only incidental to the City's status as landowner.

Sulzbach is correct that the City has a general interest in ensuring that Alaska Day celebrations occur and that hosting those events is part of Centennial Hall's mission.  But on these facts such an abstract benefit to the City is not enough to transform the fundamental legal nature of the City's relationship with Ferrick.  The City neither meaningfully controlled Ferrick's work nor accepted his services.  There was no master-servant relationship between Ferrick and the City.

### 2.    Ferrick was not the City's independent contractor working on the land.

Sulzbach also argues that the City would be vicariously liable for Ferrick's negligence under the Restatement (Second) of Torts Section 422, providing in relevant part:

---

[26]    *See Powell*, 59 P.3d at 252 n.26 (quoting RESTATEMENT (SECOND) OF AGENCY § 250, cmt. a (AM. L. INST. 1958)).

[27]    *Id.* at 249 (quoting *Hammond v. Bechtel Inc.*, 606 P.2d 1269, 1275 (Alaska 1980)).

A possessor of land who entrusts to an independent contractor construction, repair, or other work on the land, or on a building or other structure upon it, is subject to the same liability as though he had retained the work in his own hands to others on or outside of the land for physical harm caused to them by the unsafe condition of the structure

> (a) while the possessor has retained possession of the land during the progress of the work, or

> (b) after he has resumed possession of the land upon its completion.[28]

Sulzbach's argument is unpersuasive for two reasons. First, the City did not employ Ferrick as an independent contractor; the City had no formal relationship with Ferrick, who volunteered for a third party that the City allowed to use its property as a public service. Every illustration in the Comment to Section 422 uses either the verb "to employ" or "to contract with" to describe the relationship between the principal and an independent contractor. Although the language may not foreclose the possibility that a principal may be liable for a volunteer's torts, it strongly suggests that the principal and agent must have some sort of formal relationship benefitting the principal. Sulzbach concedes that Ferrick and the City had no formal relationship, and, as discussed above, Ferrick's work did not materially benefit the City.

Second, Ferrick was not doing "construction, repair, or other work on the land."[29] Section 422 "applies to any work done on a building or other structure on the land, whether it be construction, repair, or demolition . . . [and] to work done on the land

---

[28]    It was undisputed that the City retained possession of the land.

[29]    *See* RESTATEMENT (SECOND) OF TORTS § 422 (AM. L. INST. 1965).

itself preparatory to construction, such as excavation for a foundation."[30] The illustrations describe installing skylights, constructing a building, and repairing a burned building.[31] And Alaska cases considering Section 422 involved significant building modifications or major land improvements necessarily including a risk that may be difficult for a lay person to assess.[32] Ferrick was not engaged in building modification or land improvement at all; rather, he was hanging temporary decorations in the City's facility for the Alaska Day celebration.

The City had no formal relationship with Ferrick, and Ferrick was not doing the type of work necessary to impose vicarious liability under Section 422. The trial court correctly concluded that, as a matter of law, the City may not be held vicariously liable for Ferrick's volunteer work.[33]

B.    **Whether The Trial Court Erred By Denying Sulzbach Summary Judgment On Issues Relating To Ferrick's Alleged Negligence Is Unreviewable.**

The trial court denied part of Sulzbach's summary judgment motion because it concluded there was a genuine factual dispute whether Ferrick owed Sulzbach

---

[30]    *Id.* cmt. b.

[31]    *Id.* cmts. c-d.

[32]    *See, e.g., Patton v. Spa Lady, Inc.*, 772 P.2d 1082, 1084 (Alaska 1989) (installing electrical outlets); *Sloan v. Atl. Richfield Co.*, 552 P.2d 157, 157-58, 160-61 (Alaska 1976) (building concrete foundation); *Morris v. City of Soldotna*, 553 P.2d 474, 475, 481-82 (Alaska 1976) (painting sewage treatment plant).

[33]    Sulzbach also contends that public policy favors imposing vicarious liability. Sulzbach asserts that the City should be held liable because it had an opportunity to purchase insurance and was in the best position to mitigate the relevant risks. But Sulzbach ignores that both arguments apply at least as strongly, if not more so, to the Alaska Day Organization, which Sulzbach chose not to sue. And public policy arguments alone are not enough in this case to impose vicarious liability.

a duty.[34]  The case proceeded to a jury trial on the merits; the jury found Ferrick not negligent.  Sulzbach contends on appeal that the trial court should have granted partial summary judgment by concluding, as a matter of law, that Ferrick owed Sulzbach a duty of care.

We have explained that "an order denying summary judgment on factual grounds becomes unreviewable on appeal after a trial on the merits."[35]  An exception to the general rule exists if "the order was entered on a legal ground that affected the subsequent trial."[36]  But Sulzbach does not argue that the order was entered on a legal ground affecting the trial; the court denied summary judgment on this issue solely because a genuine factual dispute existed about the foreseeability of harm.[37]  The trial court's summary judgment decision on this issue therefore is unreviewable.

---

[34]     The existence of a tort duty may present legal or factual questions.  *See Arctic Tug & Barge*, *Inc. v. Raleigh, Schwarz & Powell*, 956 P.2d 1199, 1203 (Alaska 1998) ("We have made statements suggesting [that the existence of a duty always presents a factual question].  But [the appellant] reads [our case law] too categorically.  We have elsewhere held it appropriate to summarily adjudge disputed questions of tort duty when the undisputed facts support only one reasonable inference.").

[35]     *Larson v. Benediktsson*, 152 P.3d 1159, 1170 (Alaska 2007); *see Pederson v. Arctic Slope Reg'l Corp.*, 421 P.3d 58, 67 (Alaska 2018) ("[O]ur case law is clear that 'post-trial review of orders denying motions for summary judgment — at least when the "motions are denied on the basis that there are genuine issues of material fact" ' — is precluded." (quoting *Larson*, 152 P.3d at 1169)); *Wassillie v. State*, 411 P.3d 595, 614 (Alaska 2018) (Bolger, J., dissenting) ("[I]n a civil case, we generally decline to review on appeal an order that denies a defendant's motion for summary judgment on factual grounds, even when the defendant argues that there were no genuine factual issues for trial.").

[36]     *ConocoPhillips Alaska, Inc. v. Williams Alaska Petrol., Inc.*, 322 P.3d 114, 133 n.66 (Alaska 2014).

[37]     *See Lynden Inc. v. Walker*, 30 P.3d 609, 614 (Alaska 2001) (stating foreseeability of harm is relevant to existence of duty).

**C.    The Jury Verdicts Were Not Against The Weight Of The Evidence.**

To succeed on her negligence claims Sulzbach needed to prove:  (1) the defendant owed her a duty; (2) the defendant breached this duty; (3) she was injured; and (4) the breach was the "factual and proximate" cause of the injury.[38]  A party "owes a duty of due care to 'all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous.' "[39]  "We have 'made it clear that foreseeability is a broad concept and does not require that the precise harm in a given case be predictable.' "[40]  A party owing a negligence duty usually must act reasonably under the circumstances.[41]

---

[38]    *See Regner v. N. Star Volunteer Fire Dep't, Inc.*, 323 P.3d 16, 21 (Alaska 2014).

[39]    *Winschel v. Brown*, 171 P.3d 142, 146 (Alaska 2007); *Guerrero v. Alaska Hous. Fin. Corp.*, 6 P.3d 250, 254 (Alaska 2000) (explaining that when determining whether duty is owed we consider  following seven factors:  "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved." (quoting *Schumacher v. City & Borough of Yakutat*, 946 P.2d 1255, 1257 (Alaska 1997))).

[40]    *Winschel*, 171 P.3d at 146 (quoting *P.G. & G.G. v. State, Dep't of Health & Human Servs., Div. of Fam. & Youth Servs.*, 4 P.3d 326, 332 n.11 (Alaska 2000)).

[41]    *HDI-Gerling Am. Ins. Co. v. Carlile Transp. Sys., Inc.*, 426 P.3d 881, 884 n.1 (Alaska 2018).  A relevant jury instruction, which Sulzbach has not contested, set out the duty concepts for the jury's consideration:

> A property owner is negligent if the owner fails to exercise
> reasonable care to guard against unreasonable risks created
> by a dangerous condition on the property.  A person can be

(continued...)

The special verdict form asked two questions about Sulzbach's claim against each defendant: (1) was the defendant "negligent" and (2) was the defendant's "negligence a substantial factor in causing" Sulzbach's harm. For both Ferrick and the City, the jury answered "no" to question one (negligence) and did not move on to question two (causation). Based on the special verdict wording, the jury apparently concluded that neither Ferrick nor the City breached a duty to Sulzbach. Sulzbach requested a new trial, arguing that the Ferrick verdict was against the clear weight of the evidence, which the trial court denied. She renews that argument on appeal, and she also argues that the jury verdict finding the City was not negligent was against the clear weight of the evidence.

"[A] motion for new trial on the ground that the verdict is against the weight of the evidence is addressed to the sound discretion of the trial court."[42] "We 'will affirm [the denial of a new trial] if there is an evidentiary basis for the jury's decision' and 'will . . . reverse [the denial only] "if the evidence supporting the verdict was so completely lacking or slight and unconvincing as to make the verdict plainly unreasonable and unjust." ' "[43] Absent a motion for a new trial before the trial court, we

---

[41]    (...continued)
negligent by acting or failing to act. A person is negligent if he or she does something that a reasonably careful person would not do in the same situation, or fails to do something that a reasonably careful person would do in the same situation. The law does not require exceptional caution or skill, only reasonable care.

[42]    *Bolden v. City of Kodiak*, 439 P.2d 796, 801 (Alaska 1968).

[43]    *Hogg v. Raven Contractors, Inc.*, 134 P.3d 349, 352 (Alaska 2006) (footnote omitted) (first quoting *Glamann v. Kirk*, 29 P.3d 255, 259 (Alaska 2001), then quoting *Grant v. Stoyer*, 10 P.3d 594, 596 (Alaska 2000)).

"review[] the record to ascertain whether a new trial should be granted on the ground that the verdict is contrary to the clear weight of the evidence"[44] and whether "there has been a miscarriage of justice."[45] We "take the evidence and all inferences reasonably deducible therefrom in the light most favorable to the appellee."[46]

### 1. Evidence supports the jury verdict that Ferrick was not negligent.

Based on the evidence, the jury could have reasonably concluded that Ferrick was not negligent. Witness testimony suggested that the lanterns were unlikely to harm someone even if they fell. The lanterns weighed only about five-and-a-half pounds. Kluting testified that the bases of the lanterns were not very high, such that he could almost touch them while standing; that the lanterns' shape made it unlikely the entire force generated by a fall would be concentrated on someone's head; and that it was "debatable" whether the lanterns could hurt anyone. Kluting said Ferrick's temporary hanging method was within reasonable "safety margins" because the decorations were "lightweight," "collapsible," and had no "sharp points." Ferrick testified that the lanterns were "secured under normal circumstances" and speculated that the lantern fell only because of a strong wind. Although Ferrick and Kluting were adverse to Sulzbach, reasonable jurors could have believed them.

And despite Sulzbach's argument to the contrary, meaningful evidence suggests that the dancers were warned not to sit near the lanterns. Kluting testified that the dancers were "informed to stay out from underneath the [lanterns] prior to the

---

[44] *Bolden*, 439 P.2d at 801.

[45] *Heynen v. Fairbanks*, 293 P.3d 470, 474 (Alaska 2013) (quoting *Bolden*, 439 P.2d at 801).

[46] *Jakoski v. Holland*, 520 P.2d 569, 575 (Alaska 1974).

accident" and that some "dancers . . . told [him] that they had been warned" about being under the lanterns. One dancer specifically testified that a Centennial Hall employee told her to move "because they're going to be hanging the decoration." She testified that dancers reacted to the warning by moving away from Ferrick and the lanterns. Another dancer also testified that someone told them to move away from where Ferrick was working. Sulzbach concedes that "the evidence at trial adduced one instance of either [a Centennial Hall] employee or Ferrick moving some dancers physically out of the way to hang [a lantern]."

Sulzbach points to some evidence that might justify a finding that Ferrick was negligent, suggesting: Ferrick did not follow approved Centennial Hall hanging methods; the dancers were not sufficiently warned; and Sulzbach was significantly harmed. But even if Sulzbach's evidence were persuasive standing alone, she has not established that, viewing the record in the light most favorable to upholding the verdict, the evidence supporting the jury verdict is "so completely lacking or slight and unconvincing as to make the verdict plainly unreasonable and unjust."[47] We accordingly affirm the trial court's denial of a new trial on Ferrick's negligence and the jury verdict in Ferrick's favor.

### 2. Evidence supports the verdict that the City was not negligent.

Sulzbach contends the jury verdict that the City was not negligent is against the clear weight of the evidence. Sulzbach's argument is unpersuasive; viewing the evidence in the City's favor, substantial evidence supports the jury's conclusion. First, as discussed above, there was testimony that the lantern would not pose an obvious risk if it fell and that Ferrick's temporary hanging method was secure under normal circumstances. Second, as discussed above, multiple people testified that at least one

---

[47]   *See Hogg*, 134 P.3d at 352.

City employee warned the dancers not to sit near where Ferrick was working while he was hanging the decorations. And Sulzbach concedes that "the evidence at trial adduced one instance of either [a Centennial Hall] employee or Ferrick moving some dancers physically out of the way." Third, the jury could have concluded that the City acted reasonably by training Ferrick on how to conduct his decorating. In light of this evidence, a jury justifiably could have concluded that the City acted reasonably.

Sulzbach points to testimony describing the lantern and suggesting that the City was negligent because: another lantern fell while Ferrick was working; the City worked with Ferrick to hang the lantern; Ferrick did not follow the City's instructions about hanging the lanterns; no City employee supervised Ferrick; and Centennial Hall let Ferrick access the building and allowed him to use building equipment. But even assuming that all this were true, Sulzbach does not explain why the jury was not permitted to rely more heavily on other evidence. Because the jury verdict in the City's favor was not against the clear weight of the evidence such that there was a miscarriage of justice,[48] we affirm it.

### D. The Trial Court Did Not Abuse Its Discretion By Denying A New Trial Based On An Initial And Later Corrected Evidentiary Error.

Alaska Evidence Rule 611(c) states: "On direct examination, leading questions should not be allowed except . . . when the witness is hostile, an adverse party, or identified with an adverse party." Sulzbach called Kluting, a City employee, as her first witness. Sulzbach's attorney asked to treat Kluting as an adverse party due to his employment and alleged unwillingness to forthrightly answer non-leading questions. The trial court agreed that Kluting was an adverse party but decided not to allow leading questions until Kluting demonstrated that he was hostile. Sulzbach's attorney renewed

---

[48] *See supra* notes 42-46 and accompanying text (setting out standard of review for reversing jury verdict).

this request several times during Kluting's direct examination, but, concluding that Kluting was not hostile, the court did not change its ruling. During a recess the court reconsidered and concluded that it should have let Sulzbach's attorney ask leading questions on direct examination because adverse parties need not also be hostile under Rule 611(c). The court then allowed Sulzbach's attorney to ask leading questions during re-direct examination.

After trial Sulzbach moved for a new trial on the ground that the court's initial error was highly prejudicial. The court reviewed the transcript and denied the motion for three reasons: (1) "Sulzbach had sufficient opportunities to elicit testimony from Kluting"; (2) "Sulzbach [was] unable to point to any favorable information [she was] unable to elicit from Kluting"; and (3) "Sulzbach [was] unable to explain how examination of Kluting was otherwise not effective."

The trial court did not abuse its discretion by denying a new trial based on its initial error because, for the reasons the court outlined, the error did not prejudice Sulzbach.[49] The court permitted Sulzbach to ask leading questions on re-direct examination of Kluting, giving Sulzbach many opportunities to elicit favorable testimony from Kluting using leading questions. Sulzbach also had the opportunity to cross-examine and re-cross-examine Kluting during the City's case. Sulzbach points to no testimony that she hoped to elicit from Kluting but could not.

Sulzbach contends that "the timing of the error" was prejudicial because "what is first said and what the fact finders' attention is first called to, is critical in framing a case and setting how additional information will be evaluated." But Sulzbach

---

[49] *See Marron v. Stromstad*, 123 P.3d 992, 1011 (Alaska 2005) (noting that "party requesting a new trial [based on evidence-related error] has the burden of proving both error and prejudice" and that we have "great reluctance to interfere with a [trial] court's decision to deny a new trial").

has not convinced us that jurors would have perceived Kluting's responses to leading questions differently on direct versus re-direct examination, occurring about 75 minutes apart over the course of a two-week trial in which Kluting was the first witness. And the trial court, having been in the courtroom with the jurors, was in the best position to determine the prejudice caused by its own error, which it corrected in a reasonable exercise of discretion.[50]

The trial court did not abuse its discretion by denying a new trial on the ground that it made, then quickly corrected, an evidence-related error.[51]

## V.    CONCLUSION

The judgment is AFFIRMED.

---

[50]    *See Hogg*, 134 P.3d at 353 ("Unlike this court, for which testimony is necessarily but words on a page, the trial court had the opportunity to hear the witnesses testify in person.").

[51]    Sulzbach raised other issues in her points of appeal, including various attorney's fees issues. Those arguments are waived as insufficiently briefed because she does not mention them at all in her briefing. *See Casciola v. F.S. Air Serv., Inc.*, 120 P.3d 1059, 1062 (Alaska 2005) ("We do not consider arguments that are inadequately briefed.").